✎JS 44  (Rev. 12/07, NJ 1/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff   Ocean

County of Residence of First Listed Defendant   Kings County, New York

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, Telephone Number, and Email Address)

Ronald D. Coleman, Hoffman Polland & Furman, PLLC, 220 E. 42 St., New York, NY 10017, (212) 338-0700

Attorneys (If Known)

Noah M. Burton, Patton Boggs LLP, One Riverfront Plaza, Newark, NJ 07102 - (973) 848-5600 NBurton@PattonBoggs.◨

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☐ 3  Federal Question
      (U.S. Government Not a Party)

☐ 2  U.S. Government
      Defendant

☒ 4  Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1  Original
      Proceeding

☒ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      another district
      (specify)

☐ 6  Multidistrict
      Litigation

☐ 7  Appeal to District
      Judge from
      Magistrate
      Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Confirmation of arbitration award

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S)   (See instructions):

JUDGE _____

DOCKET NUMBER _____

Explanation:

DATE   5/7/08

SIGNATURE OF ATTORNEY OF RECORD

Noah M. Burton (NB-5678)
PATTON BOGGS LLP
One Riverfront Plaza, 6th floor
Newark, NJ 07102
(973) 868-5600
NBurton@PattonBoggs.com
*Attorneys for The Jewish*
*Foundation School and The*
*Rabbi Jacob Joseph School*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OORAH, INC., | 07 Civ. _____ |
| Plaintiff, | |
| -against- | **NOTICE OF REMOVAL** |
| MARVIN SCHICK, THE JEWISH FOUNDATION SCHOOL AND THE RABBI JACOB JOSEPH SCHOOL, | |
| Defendants. | |

**PLEASE TAKE NOTICE** that Defendants, Marvin Schick, the Jewish Foundation School, and the Rabbi Jacob Joseph School (collectively "Defendants"), hereby remove the above entitled action (the "Action") from the Superior Court of New Jersey, Ocean County, to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1441, *et seq.*

In support of this Notice of Removal, Defendants respectfully state the following:

1.     Defendants are defendants in a civil action filed on April 4, 2008 in the Superior Court of New Jersey, Ocean County, under Docket Number L-1088-08. A copy of the Summons and Complaint in the Action is attached hereto as Exhibit A.

2.     This Court has subject matter jurisdiction of this Action pursuant to 28 U.S.C. § 1332 inasmuch as this lawsuit involves citizens of different states and, while the Complaint seeks damages in an amount to be determined at trial, it is apparent from the allegations contained in the Complaint that the amount in controversy exceeds $75,000.

3.     Plaintiff Oorah, Inc. is a New Jersey corporation whose principal place of business is in the State of New Jersey.

4.     Defendant Marvin Schick is a resident and a citizen of the State of New York. Defendant Jewish Foundation School is a New York corporation whose principal place of business is in the State of New York. Defendant Rabbi Jacob Joseph School is a New York corporation whose principal place of business is in the State of New York. As a result, there is complete diversity of citizenship and this Action is properly removable to this Court.[1]

5.     Removal of this action is proper under 28 U.S.C. § 1441 because, *inter alia*, this is a civil action brought in the New Jersey State Court over which the United States District Court, District of New Jersey would have had jurisdiction had this Action been brought in the United States District Court, District of New Jersey.

6.     This removal is timely under 28 U.S.C. § 1446(b) since less than thirty days have elapsed following purported service of the Summons and Complaint upon any of the Defendants. Aside from the purported service and filing of the papers set forth in Exhibit A attached hereto, no further proceedings have occurred in the Action.

---

[1] In the Complaint, Plaintiff alleges that Defendant Rabbi Jacob Joseph School is a New York corporation that does business both in Staten Island, New York and in Edison, New Jersey (Compl. ¶ 10). In fact, the Rabbi Jacob Joseph School that is a party to the dispute with Plaintiff is a New York corporation and its only places of business are located in the State of New York. A separately incorporated entity, Rabbi Jacob Joseph School, Inc., is a New Jersey corporation and does business in Edison, New Jersey. While that New Jersey entity is an affiliate of the Rabbi Jacob Joseph School in New York, it is neither a party to the dispute with Plaintiff, the underlying arbitration agreement, or to this Action.

WHEREFORE, Defendants hereby removes to this Court the Action now pending in the Superior Court of New Jersey, Ocean County, bearing docket number L-1088-08, and pray that this Court assume jurisdiction of the Action and make such other and further Orders as may be necessary to further the ends of justice.

Dated: Newark, New Jersey
      May 7, 2008

PATTON BOGGS, LLP

By: _____
Noah M. Burton (NB-5678)
One Riverfront Plaza, Sixth Floor
Newark, NJ 07102
(973) 848-5600
NBurton@PattonBoggs.com

*Attorneys for Defendants*

Of Counsel:
Eli Feit
HELLER, HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, NY 10017
(212) 685-7600
*Attorney for Defendants*

# EXHIBIT A

| | |
|---|---|
| Attorney(s) Ronald D. Coleman | **Superior Court of New Jersey** |
| Office Address Hoffman Polland & Furman PLLC | |
| 220 East 42nd Street | |
| Town, State, Zip Code New York, NY 10017 | Ocean _____ County |
| Telephone Number (212) 338-0700 | Law _____ Division |
| Attorney(s) for Plaintiff Oorah, Inc. | |

Oorah, Inc. _____

_____

Docket Number  L-1088-08 _____

       Plaintiff(s)

       Vs.

Marvin Schick, the Jewish Foundation School and

the Rabbi Jacob Joseph School,

       Defendant(s)

# CIVIL ACTION

# Summons

From The State of New Jersey To The Defendant(s) Named Above:

     The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135 and completed Case Information Statement) if you want the court to hear your defense.

     If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

     If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

Dated: April 4, 2008 _____

_Christine Higgins_

Christine Higgins
Acting Clerk of the Superior Court

Name of Defendant to Be Served: Marvin Schick _____

Address of Defendant to Be Served: 1529 56th Street, Bklyn _____

NOTE: The Case Information Statement is available at http://www.njcourtsonline.com/civil/forms/10517.pdf

page 1 of 4

# CIVIL CASE INFORMATION STATEMENT (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under Rule 4:5-1
**Pleading will be rejected for filing, under Rule 1:5-6(c),
if information above the black bar is not completed or
if attorney's signature is not affixed.**

| FOR USE BY CLERK'S OFFICE ONLY |
| --- |
| PAYMENT TYPE: CK   CG   CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| 1. ATTORNEY/PRO SE NAME  Ronald D. Coleman | 2. TELEPHONE NUMBER  (212) 338-0700 | 3. COUNTY OF VENUE  Ocean |
| --- | --- | --- |
| 4. FIRM NAME (If applicable)  Hoffman Polland & Furman PLLC | | 5. DOCKET NUMBER (When available)  L-1088-08 |
| 6. OFFICE ADDRESS  220 East 42nd Street, Suite 435  New York, NY 10017 | | 7. DOCUMENT TYPE  Complaint |
| | | 8. JURY DEMAND   ☐ YES  ☒ NO |

| 9. NAME OF PARTY (e.g., John Doe, Plaintiff)  Oorah, Inc. | 10. CAPTION  Oorah, Inc. v. Marvin Schick, the Jewish Foundation School and the Rabbi Jacob Joseph School |
| --- | --- |

| 11. CASE TYPE NUMBER  (See reverse side for listing)  **599** | 12. IS THIS A PROFESSIONAL MALPRACTICE CASE?  ☐ YES  ☒ NO  IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| --- | --- |
| 13. RELATED CASES PENDING?  ☐ YES  ☒ NO | 14. IF YES, LIST DOCKET NUMBERS |
| 15. DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)?  ☐ YES  ☒ NO | 16. NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN  ☐ NONE  ☒ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| 17. A. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?  ☒ YES  ☐ NO | IF YES, IS THAT RELATIONSHIP  ☐ EMPLOYER-EMPLOYEE  ☐ FAMILIAL  ☐ FRIEND/NEIGHBOR  ☒ BUSINESS  ☐ OTHER (explain) |
| --- | --- |
| 18. B. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?  ☐ YES  ☒ NO | |

19. USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

FILED
MAR 2 4
SUPERIOR COURT OCEAN COUNTY

| 20. DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?  ☐ YES  ☒ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION: |
| --- | --- |
| 21. WILL AN INTERPRETER BE NEEDED?  ☐ YES  ☒ NO | IF YES, FOR WHAT LANGUAGE: |

22. ATTORNEY SIGNATURE: *Ronald D. Coleman*

Ronald D. Coleman
HOFFMAN POLLAND & FURMAN PLLC
220 East 42nd Street – Suite 435
New York, NY  10017
(212) 338-0700
Attorneys for Plaintiff Oorah, Inc.



| | |
|---|---|
| OORAH, INC., <br><br>        Plaintiff, <br><br>    - vs. - <br><br> MARVIN SCHICK, the JEWISH FOUNDATION SCHOOL and the RABBI JACOB JOSEPH SCHOOL, <br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY OCEAN COUNTY: LAW DIVISION <br><br> DOCKET NO. L-1088-08 <br><br> CIVIL ACTION <br><br> **COMPLAINT** |

Plaintiff, Oorah, Inc., by and through its undersigned attorneys, for its complaint against defendant Rabbi Jacob Joseph School, alleges as follows:

### THE PARTIES

1.   Plaintiff Oorah, Inc. ("Oorah") is a New Jersey not for profit corporation organized under the laws of the State of New Jersey.

2.   Oorah has been granted exemption from federal income tax under section 501(a) of the Internal Revenue Code as an organization described in Section 501 (c)(3) and determined by the Internal Revenue Service to be a publicly

supported organization described in sections 509(a)(1) and 170(b)(1)(A).

3.    Oorah does business at 1805 Swarthmore Avenue, Lakewood, New Jersey.

4.    Oorah, which means "Awaken" in Hebrew, was founded in 1980 with the goal of awakening Jewish children and their families to their heritage and assisting Jews in need by providing for the physical and spiritual needs of distressed and immigrant Jewish youth and their families.

5.    Oorah provides scholarships, basic food staples, nutritional products, clothing, household items, furnishings and reduced utility rates, among other things, to help ease the financial burdens of these families.

6.    An umbrella organization with worldwide headquarters in the United States, Oorah also distributes the above items to a large number of diverse organizations, ranging from camps for cancer patients to private schools with low-income parent bodies to religious institutions.

7.    On the international level, Oorah provides relief funding to families in unstable countries such as Russia, Georgia and Israel.

8.    Defendant Marvin Schick is a New York resident residing at 1529 56th St., Brooklyn, New York.

9.   Defendant Jewish Foundation School is, 835 Forest Hill Road Staten Island, New York.

10.   Defendant Rabbi Jacob Joseph School is, upon information and belief, a not for profit organization organized under the laws of the State of New York, doing business at One Plainfield Ave, Edison, New Jersey and 3495 Richmond Road, Staten Island, New York.

11.   The Jewish Foundation School is owned and operated by the Rabbi Jacob Joseph School, and both are for all intents and purposes run by defendant Schick.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this dispute because plaintiff is a New Jersey corporation doing business in Lakewood, New Jersey, and because defendants' willful actions have caused and are continuing to cause damage to defendants in this State.

13.   Venue is appropriate in the County of Ocean because plaintiff is a New Jersey corporation doing business in Lakewood, New Jersey, in the County of Ocean.

## FACTS

14.   All the parties to this dispute are orthodox Jews, or are institutions operating as orthodox Jewish institutions under the aegis of orthodox Jews.

3

15. Among Oorah's programs is one that enables children to enroll in Jewish day schools, or yeshivas, where they receive a full religious and general education straight through high school.

16. For many years, the Jewish Foundation School has been one of the many schools in which Oorah enrolls the students it sponsors.

17. Beginning in early 2006, a disagreement arose over the tuition rates Oorah pays to the Jewish Foundation School for the children it sponsors there.

18. In early 2006, Schick began making public statements criticizing Oorah.

19. Schick also began to make written monetary demands on parents of students enrolled in the Jewish Foundation School under Oorah's auspices.

20. The defendants' demands were contrary to Oorah's understanding of its longstanding agreement with the Jewish Foundation School that parents of Oorah-sponsored students would never be approached for any increased amount of tuition beyond their initial commitment, and that any communications regarding additional financial arrangements would be directed only to Oorah.

21. Defendants demanded that parents pay total tuition of $4000 per student.

4

22.   Schick denied that the arrangement described in the foregoing paragraph ever existed.

23.   Schick also stated repeatedly that if in fact this had been the arrangement, the Jewish Foundation School would not longer abide by it.

24.   The parties were, however, unable to resolve the matter.

25.   At Schick's request, in September, 2006, Oorah's representatives met with him in his home, with him members of the Jewish Foundation School board before a rabbi of his choosing, Rabbi Yaakov Lehrfeld.

26.   The parties agreed prior to this meeting that Rabbi Lehrfeld's decision would be binding.

27.   Unfortunately, the meeting with Rabbi Lehrfeld did not product agreement or a solution.

28.   Schick began to approach orthodox Jewish communal leaders, including leading philanthropists and supporters of Oorah, privately with his criticisms of Oorah.

29.   Schick, in his public and private statements to third persons and to the April Bais Din, accused Oorah of financial irregularities.

30.   In response, in October, 2006, Oorah referred the matter to the well-respected Machon le'Hora'ah, a

5

rabbinical court or arbitration board in Monsey, New York, and served Schick with a *hazmanah*, or summons.

31. Orthodox Jewish law religious principles require that a person served with a *hazmanah* from a duly-constituted rabbinical court respond to it.

32. Dr. Schick did not respond to the *hazmanah*.

33. In November, 2006, Machon le'Hora'ah issued a second *hazmanah*, to which Schick responded with several objections and demands, as well as a counterclaim.

34. Schick refused, ultimately, to appear before Machon le'Hora'ah.

35. Finally, in April of 2007, defendants agreed to submit their dispute to a specially-constituted *beis din*, i.e., rabbinical arbitration board or court, consisting of Rabbis Dovid Feinstein, Aharon Feldman and Dovid Shustal (the "April Bais Din").

36. The three rabbis comprising the April Bais Din are among the most prominent orthodox rabbinic figures in North America.

37. On April 29, 2007, the Rabbi Jacob Joseph School and the Jewish Foundation School, represented by Schick, and Oorah, entered into a rabbinical Arbitration Agreement. A true copy of that agreement is attached hereto as Exhibit A.

6

38.   The Arbitration Agreement obligated the parties to accept the decision of the April Bais Din as "conclusive and binding."

39.   The Arbitration Agreement provided that the decision of the April Bais Din be "civilly enforceable when so directed by the Bais Din."

40.   In addition, the parties entered into a mutual agreement of non-disparagement in connection with the April Bais Din (the "Non-Disparagement Agreement").

41.   Oorah insisted on the Non-Disparagement Agreement as a condition to proceeding with the April Bais Din, because it believed that regardless of the outcome of the proceedings, Oorah's delicate relationship with its donors could be destroyed by Schick's continued public criticism of Oorah.

42.   The hand-written undertaking prepared and signed by Schick, constituting his side of the Non-Disparagement Agreement, read, in part, "This is to acknowledge that the Rabbi Jacob Joseph School shall full accept the *psak* [ruling] of the [Bais] Din.  Furthermore, subsequent to the Din Torah [arbitration proceedings] we will not write or transmit in any forum charges against Oorah."  A true copy of the Non-Disparagement Agreement is attached hereto as Exhibit B.

7

43.  On April 30, 2007, the April Bais Din ruled that Oorah was obligated to pay $2700 for each Oorah-sponsored student in the Jewish Foundation School, "in accordance with the agreement between them."   A true copy of an official English translation of the Arbitration Ruling, signed by the three rabbis on the April Bais Din, is attached hereto as Exhibit C.

44.  Following its own investigation and taking of testimony, the April Bais Din also ruled on April 30, 2007 that, following examination, with the assistant of an accountant, of the books and records of Oorah, as well as testimony from the directors, accountant, and bookkeepers of Oorah, it was "fully satisfied that every item in the [IRS 990 income tax] return represented reasonable expenditures in complete consonance with the mission of the organization and saw no reason to suspect that there were any irregularities."   A true copy of this decision is attached hereto as Exhibit D.

45.  On May 28, 2007, the April Bais Din issued a "Clarification" of its earlier ruling, making it clear that the $2700 per child figure in the April Bais Din's ruling was a total figure and was not meant to suggest Oorah had to pay $2700 per child regardless of parental contribution. A true copy of the official English translation of the

Clarification, signed by the three rabbis on the April Bais Din, is attached hereto as Exhibit E.

46. The Clarification also stated, "With great pain, we have heard that Oorah has been accused of wrongdoing by failing to comply immediately with our original ruling. This accusation is false since Oorah had the right to delay its payment until this issue was clarified. Furthermore, immediately upon receiving this clarification, it paid the School a large amount towards its obligation and deposited a check for the balance pending determination of the exact amount of the parents' tuition."

47. The "accusation" against Oorah was made by Schick, despite the Non-Disparagement Agreement.

48. Public and private criticism of Oorah by defendants, in fact, only escalated following the issuance of the Clarification.

49. In fact, in its November 2007 "RJJ Newsletter" published to supporters, alumni, parents and friends of the Rabbi Jacob Joseph School, and on his Internet blog, Schick wrote, in part, about Oorah as follows:

> No one should be proud of the abysmal record of Oorah, the organization that is adept at public relations and fundraising as it promotes the claim that the money it raises goes to assist Jewish

9

public school families that agree to send their children to a yeshiva or day school. Only a small percentage of its income goes toward this purpose. Furthermore, Staten Island is Oorah's center of activity. Our schools have approximately one-hundred Oorah students this year and this is at least one-quarter and probably considerably more of all the students that Oorah claims to have placed, yet we will not receive anything this year from the organization. This will add enormously to the financial burden on our Staten Island schools.

Oorah's wrongdoing is the saddest episode in my more than fifty-five years of devotion to Torah chinuch. I hope that one day I will write at greater length about the moral stain attached to this organization. For now, my prayer and hope is that there will be sufficient concern about the Jewish children whose Jewish future is greatly at risk.

A true copy of the foregoing, as found on the Internet and in the hard-copy "Newsletter" published by defendants Jacob Joseph School and Schick, are attached hereto as Exhibit F.

50. Oorah was damaged by the foregoing publication.

51.  On November 7, 2007, the April Bais Din issued a letter condemning defendants' publication of the above passage, describing it as "an utter disregard of our ruling and a flagrant violation of his commitment to refrain from making derogatory remarks against Oorah" (the "November Letter").  A true copy of the November Letter is attached hereto as Exhibit G.

52.  The November Letter concluded, "We therefore call on Dr. Schick to publicly retract his statement and to redress any damages he may have caused Oorah.  Until this is done, Oorah is justified in using any measures permitted by Halacha [Jewish religious law] to rectify this wrongdoing."

53.  Schick has not retracted his statement.

54.  Schick has not redressed the damages he has caused Oorah.

55.  Schick has continued to publicly and privately criticize Oorah, including by ongoing publication of his defamatory statement on his Internet blog.

56.  After Schick continued to flaunt the April Bais Din, its members referred the matter and conveyed jurisdiction to a "standing" rabbinical court called Beis Meisharim of Lakewood, New Jersey, which in turn authorized Oorah, as a matter of Jewish religious law, with the

concurrence of Rabbi Feldman, to seek civil enforcement of the rulings of the April Bais Din, as well as all other recompense and other relief available under civil law and equity.

### FIRST CAUSE OF ACTION
### Breach of Contract

57. Oorah repeats and realleges the foregoing allegations as if set forth fully herein.

58. Defendants entered into a contract, for valid consideration, with Oorah to abide by all rulings of the April Bais Din, and not to disparage Oorah in any way following the proceedings of the April Bais Din.

59. Oorah has complied with all its contractual obligations.

60. Defendants have breached their contract with Oorah.

61. Oorah has been damaged by defendants' breach, in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Promissory Estoppel

62. Oorah repeats and realleges the foregoing allegations as if set forth fully herein.

63. Defendants assured Oorah that it would abide by all rulings of the April Bais Din, and that it would not disparage Oorah in any way following the proceedings of the April Bais Din as set out in the representations made by them in the Non-Disparagement Agreement.

64. Defendants reasonably expected that Oorah would rely on the foregoing representations.

65. Oorah did rely on defendants' representations, and agreed to proceed with the proceedings of the April Bais Din, although at this point – because it was Schick demanding payment from Oorah – it had a legal right to insist on rabbinical arbitration in the forum of its choice.

66. Defendants, despite their representations, did not abide by the rulings of the April Bais Din, nor the representations made by them in the Non-Disparagement Agreement.

67. Oorah has been damaged by reason of their reasonable reliance on defendants' representations and subsequent failure to honor them, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### Confirmation and Enforcement of Arbitral Award

68. Oorah repeats and realleges the foregoing allegations as if set forth fully herein.

69. On April 29-30, 2007, Oorah and the defendants submitted their controversies to the April Bais Din sitting as a board of arbitration under law, as set forth in Exhibit A.

70. Thereafter the April Bais Din heard the parties, and on April 30, 2007, made and published their written determinations and award, as set forth in Exhibits C, D and E.

71. Oorah duly performed all the conditions of the award, but defendants have refused to comply with their obligations thereunder.

WHEREFORE, plaintiff Oorah prays requests that defendants be ordered to pay plaintiff its damages, in an amount to be determined at trial, arising from its breaches, promissory estoppel and failure to comply with the arbitral award; enter an injunction confirming the arbitral award and mandating defendants' compliance therewith; and awarding reasonable costs and expenses,

14

including attorneys' fees, and such other relief provided by law and equity and as shall be determined to be just.

HOFFMAN POLLAND & FURMAN PLLC

By: _____

Ronald D. Coleman
220 East 42nd Street – Suite
     435
New York, NY  10017
(212) 338-0700
Attorneys for Plaintiff
     Oorah, Inc.

Dated:     New York, NY
           March 20, 2008


**CERTIFICATION PURSUANT TO R. 4:5-1**

I certify that the matter in controversy is not the subject of any other court action or arbitration proceeding except as set forth in the foregoing allegations, and that no other parties should be joined in this action.


Dated:  March 20, 2008

_____
     Ronald D. Coleman

HOFFMAN POLLAND & FURMAN, PLLC
220 East 42nd Street – Suite 435
New York, NY  10017
(212) 338-0700
Attorneys for Plaintiff
     Oorah, Inc.

15

בס"ד

## Arbitration Agreement -- שטר בירורין

The undersigned parties hereby submit the matters in dispute between them concerning

*RABBI JACOB JOSEPH SCHOOL / NEWISH FOUNDATION SCHOOL REPRESENTED*
*BY DR. MARVIN SCHICK   VS.  OORAH, INC REPRESENTED BY RABBI ELIAHU MINTZ*

and all related matters to the binding arbitration by the Bais Din composed of

*RABBIS DOVID FEINSTEIN, AHARON FELDMAN, DOVID SHUSTAL*

("the Daiyonim" i.e., the Rabbinic Judges).

The undersigned parties further agree and commit themselves to:

1. Accept the decision of the Bais Din as conclusive and binding, and to abide by its decision and instructions; not attempt to introduce any outside authorities (i.e. other בתי דין, רבנים, or civil court actions) in any effort to contest the decision of the Bais Din.

2. That this arbitration and the resultant Decision of the Bais Din will be civilly enforceable, when so directed by the Bais Din, and that the Daiyonim will not be subject to being deposed by any court of law.

3. Authorize the Daiyonim to subpoena witnesses and evidence, and to accept some forms of evidence as relevant and revealing even if they might not be actual עדות (Halachic testimony), and to adjudicate these matters according to the Daiyonim's interpretation of the Halacha (Torah Law).

4. Authorize the Bais Din to make a judgment and render a Decision on the basis of פשרה קרובה לדין (Halachic compromise), and to arbitrate a decision according to their findings of the justice and righteousness of the case (לפי הצדק והיושר), and to follow the majority opinion in all cases, even if one Daiyon would abstain from signing the Decision.

5. That the Daiyonim will not be held personally liable in case of possible error in judgment according to true Torah Law, whether that of שיקול הדעת (discretion) or that of דבר משנה (Halachic principle).

6. That a valid מעשה קנין (act of commitment) was made by all parties hereto demonstrating their respective commitment to adhere to this agreement.

In Witness Whereof the parties hereby sign this Arbitration Agreement on this day of _2 9_
_APRIL 2007 / 11 IYAR 5767_

**Claimants:**

**Respondents:**

בס״ד, ROSHEI YESHIVA OF VAAD HARABON OF TORAH UMESORAH

DEAR ROSHEI YESHIVA, שליט״א,

THIS IS TO ACKNOWLEDGE THAT THE RABBI JACOB JOSEPH SCHOOL AND THE JEWISH FOUNDATION SCHOOL SHALL FULLY ACCEPT THE PSAK OF THE BETH DIN-FURTHERMORE, SUBJECT TO THE DIN TORAH WE WILL NOT WRITE OR THREATEN IN ANY EVER CHARGES AGAINST OTHERS.

IT IS THE FERVENT HOPE THAT שי'כרש"ש AND JFS WILL WORK TOGETHER FOR DE AMI בתוך כלל ישראל.

על זאת
על זה ב'ימי

## ARBITRATION RULING
### (Translation)

The undersigned sat as a Bais Din when Dr. Marvin Schick, representative of The Rabbi Jacob Joseph School and The Jewish Foundation School (hereinafter "the school"), presented a claim against Rabbis Chaim Mintz and Eliahu Mintz representatives of the organization Oorah (hereinafter "the organization") for payment of tuition of $2700 for the school year 5767 (2006-2007) to The Jewish Foundation School for each of more than eighty pupils which the organization placed in the school in accordance with an agreement reached between them when the children were originally enrolled in the school several years earlier.

Against this, the representatives of the organization argued that although they originally obligated themselves to this amount, the school violated this agreement when the school demanded in a letter to the parents that they pay a large tuition ($4000) after the organization requested that the school not do so. The organization claims that this demand was extremely harmful to the children and to the organization for the following reasons: A. The parents are not religious and agreed to enroll their children in a religious school only because this would be tuition free, and the pressure of a demand for higher tuition might cause them to remove their children from the school. B. The demand seriously harmed the relationship of trust which existed between the parents and the organization who promised them that the education would not cost them money. In addition, the organization argued that it is not satisfied with several educational policies of the school and they do not see itself responsible to pay the pupils' tuition until the school includes it in the school's educational oversight committee where it will be better able to control the education of the school.

After hearing at length the arguments of both sides, our unanimous opinion is that the arguments of the organization do not have enough substance to free it from its obligation. Since the organization kept the children in the school, it is responsible to pay their tuition.

We therefore rule that the organization is obliged to pay the school sum of $2700 per child in accordance with the agreement between them.

Signed in New York City on 12 Iyar 5767 (April 30, 2007)

Rabbis: Dovid Feinstein    Aharon Feldman    Dovid Shustal

בס"ד
יב אייר תשס"ז

April 30, 2007

## DECISION

After claims by certain individuals that based on its IRS 990 income tax return the organization known as Oorah was improperly using the funds which it raised, the Vaad Roshei Yeshiva of Torah Umesorah appointed the undersigned to serve as a Bais Din to investigate these charges.

The directors of Oorah agreed to appear before us and answer any question we had, and agreed as well to undergo an independent audit if we would so require it.

Under the guidance of a highly rated accountant, we met with the directors, accountant and bookkeepers of Oorah, and questioned them for nearly two hours about their activities and the details of this return. We were fully satisfied that every item in the return represented reasonable expenditures in complete consonance with the mission of the organization and saw no reason to suspect that there were any irregularities.

We have therefore decided that the charges against them are without basis, and that there is no reason for them to undergo a detailed audit. We wish them success in their highly successful and multifaceted work in returning alienated Jews to their heritage.

Signed: Rabbis Dovid Feinstein  Aharon Feldman   Dovid Shustal

ב"ה

## CLARIFICATION

The following is a clarification of our ruling on 11 Iyar 57667 (30 April, 2007) when we sat as a Bais Din in a dispute between the Jewish Foundation School and the organization Oorah. At that time we concluded as follows:
*"We therefore rule that the organization is obliged to pay the school sum of $2700 per child in accordance with the agreement between them."*

It became subsequently clear that this ruling required clarification. Oorah argued that this meant $2700 for each child it sent to the School, reduced by the amount of tuition paid by the parents, as has been their practice in previous years.

On the other hand, the School argued that this meant $2700 in addition to the parents' tuition. Although the School agreed that in past years the organization had indeed deducted parents' tuition from their payments, the intent of the School was otherwise for the current year. Furthermore, even in past years Oorah should have been paying much more than they agreed to pay since, in the School's opinion, it has the means to pay and the cost of education is far in excess of $2700 per child.

After sitting as a Bais Din and hearing the arguments of both sides on May 20, 2007 (3 DSivan 5767), we have unanimously agreed to the following:

Although undoubtedly the cost of education far exceeds $2700 per child, Oorah cannot be compelled to pay more than it accepted upon itself to pay. Like any other philanthropist, Oorah has the right to allocate its funds in any way it sees fit. Since no verbal or written agreement changed its original commitment, Oorah does not have to pay more than this amount.

**Therefore, in clarification of our previous ruling, Oorah should pay the sum of $2700 per child deducted by the parents' tuition.**

In further clarification, we would like to add that "parents' tuition" refers only to the tuition agreed upon by parents at the time of the students' enrollment. Last year and this year, the School appealed to parents to increase their tuition to bring it closer to the full tuition of $4000. Any tuition payments raised from these appeals is not to be deducted from Oorah's obligation.

In conclusion: With great pain, we have heard that Oorah has been accused of wrongdoing by failing to comply immediately with our original ruling. This accusation is false since Oorah had the right to delay its payment until this issue was clarified. Furthermore, immediately upon receiving this clarification, it paid the School a large amount towards its obligation and deposited a check for the balance pending determination of the exact amount of the parents' tuition.

We call on both sides to avoid any statement which might give rise to the vilification of the other side and to continue midst love and peace in their remarkable efforts for spreading Torah education among Jewish children.

Signed, New York, 11 Sivan 5767 (May 28, 2007),

Rabbis: Dovid Feinstein   Aharon Feldman   Dovid Shustal

# Rabbi Jacob Joseph School
3495 Richmond Road
Staten Island, NY  10306

Tel.  (718) 979-6333   Fax  (718) 979-5152

November 2007
Cheshvan 5768

## The RJJ Newsletter

Rav Zeidel Epstein ז״ל served for nearly forty years as a Rebbi and Rosh Mesivta at the Yeshiva on Henry Street, teaching a high Gemara class and teaching, as well, by example and through his inspiring words how religious Jews should live ethical lives in accordance with their Torah obligations. When he retired, he and his wife moved to Israel, living in Jerusalem where his mussar or ethical discourses inspired additional generations of yeshiva students. He passed away in his one-hundredth year, shortly before Rosh Hashanah, mourned by talmidim and Torah leaders in Israel and here. A memorial assembly was held at the Edison Mesivta, with Rav Aharon Feldman, the Rosh Yeshiva of Ner Israel in Baltimore, the featured speaker.

In my remarks, I noted the tendency to speak about our revered Torah leaders by referring to their acts of chesed and their scholarly eminence. This tendency distorts, in my judgment, how we should regard these outstanding people. In truth, most of us do acts of chesed, at least from time to time, and some of us excel at times in Talmudic study. What distinguishes those whom we regard with great admiration and respect is the constancy of their behavior, their endless devotion to the Klal and their unceasing commitment to Torah study. I imagine that we could collect nice stories about Rav Zeidel. What was most remarkable about him was the normalcy of his piety and integrity. These qualities were his essence throughout all of his days. There were no peaks, so to speak, for he always lived at a high ethical level.

His warm feelings toward RJJ never abated and, in a fascinating way, they seemed to grow stronger in Israel. He was gratified by the rebuilding of the yeshiva and nourished by visits of former talmidim from the U.S. who continued to regard themselves as his talmidim. He greeted us in his Jerusalem home with the familiar smile, warmth and enthusiasm that were his hallmarks when he taught us in the classroom.

As he expressed in the introductions to his seforim and in other ways, he was grateful for the way the yeshiva treated him and other Judaic faculty members after their retirement. Year after year, he donated approximately twenty percent of his pension to the yeshiva.

Rav Zeidel was particularly gratified by the achievements of the Edison Mesivta. Just four years ago, when we dedicated the new Beth Medrash building, he wrote a letter of praise and encouragement, saying "My heart rejoices as I remember the early days" of his teaching at the yeshiva. He asked in instructions that he left to his family that his tombstone include his service at Yeshiva Rabbeinu Yaakov Yosef.

His love of us is engraved on our hearts and while his passing denotes the loss of our last major link to RJJ's glorious past on the Lower East Side, he shall continue to inspire us. His memory is already a blessing.

2

## Reflections on Enrollment

Day school and yeshiva enrollment statistics are more than a bunch of numbers telling us how many students there are in how many schools and at what grade levels. They are portals into understanding contemporary Jewish life, providing vital information about the religious health of American Jewry and about what is transpiring in different communities. As a notable example, the well advertised problems confronting the Conservative movement are reflected in declining enrollment in Solomon Schechter schools.

I will conduct next year, please G-D, my third day school census, five years after the previous survey. Inevitably, there will be schools with fewer students, either because of demographic changes in the areas they serve or the establishment of competing day schools or some other factor. We will also learn about schools that have closed. About 20% of the schools included in the 2003 census had fewer students than they had in 1998 and about three dozen day schools in operation in 1998 had closed. Overall, of course, there were enrollment gains and that will be the story when the data is collected next year, primarily because of high fertility in the chassidic and yeshiva-world sectors.

The day school world is remarkably vulnerable to shifting terrain and fortunes, notably at the mesivta or boys high school level where parents are nervous about how their sons will navigate the crucial teen years and increasingly prefer small schools that invariably have but one class at each grade level. They want a school that fits their sons' capabilities and orientation. The ambition – the term is used here in an entirely positive sense – of young Torah scholars to make a mark in the yeshiva world after many years of intensive study has also resulted in the proliferation of smaller mesivtas. As a consequence, some older schools have experienced enrollment declines. Our Edison Mesivta has fewer students than it had at its peak, this despite its strong staff and reputation.

As housing costs make buying a home in Brooklyn or elsewhere in the city and suburban areas beyond the means of many yeshiva-world families and as remaining in Lakewood is a desirable option for former kollel families, there is a strong prospect that Brooklyn yeshivas and Beth Jacobs will suffer enrollment declines. This isn't inevitable, if only because experience teaches that demographic patterns frequently defy predictions. If decline occurs in these schools, likely it will be a slow process. It is certain that Lakewood schools are experiencing explosive growth. There was a two-thirds enrollment increase between 1998 and 2003 and next year's census will show that the trend has continued.

What about Staten Island where the Jewish population has grown at a rapid pace, with the number now estimated at nearly 50,000? Our three schools – they are the only ones providing a basic or elementary school level religious education – have about the same number of students they had last year. In fact, enrollment has been steady for a number of years.

As is true primarily of modern and centrist Orthodox day schools, each year our Staten Island schools lose students whose families have made aliya, on the average between a dozen and twenty students per year. Aliya from the U.S. is rising, thanks in part – and perhaps in large measure – to high day school tuition and medical costs. The numbers

3

may not affect in an appreciable way the overall American Jewish population statistics. They clearly have an impact on day school enrollment and this impact is cumulative, by which I mean that over the span of eight or ten years of elementary school enrollment, the numbers are substantial.

In Willowbrook, where the Staten Island Orthodox are mainly concentrated, the religious population is substantially middle-aged, so that there are fewer children of school age. There are younger families, but their number does not offset the impact of an aging population on school enrollment and this is unlikely to change in view of the paucity of available housing. When we consider the two factors just described, stable enrollment in our schools may be regarded as a measure of success and in an important way is. That is, until we take into account the growing number of Jewish families, many with young children, that have moved to Staten Island in recent years. Enrollment stability means that with each passing year, a smaller percentage of Staten Island Jewish children are now receiving a meaningful religious education.

The percentage of Staten Island Jewish children who attend a day school is among the lowest in the country and it is dropping. Sadly, Staten Island is not alone in this regard, as around the United States and especially away from New York and New Jersey relatively few Jewish children are in full-time Jewish schools. Even in the New York area, the picture is far from satisfactory. In Suffolk County, only a bit more than a handful of Jewish children are in any Jewish day school. As for Staten Island, when we consider how many families are ex-Israelis or the children of ex-Israelis, people who have ongoing contact with family members in Israel, speak Hebrew and have a traditional background, it is tragic how few children are enrolled in a day school.

Unfortunately, the socio-economic profile of Jewish Staten Island works against day school education, firstly because unlike nearly all other significant Jewish communities, Staten Island is bereft of the Jewish institutional and organizational infrastructure that to an extent can prop up Jewish life. Even Chabad is no more than a minor presence. Economically, the Staten Island community possesses neither the wealth nor the commitment that are important features of Jewish life elsewhere.

Already, thousands of Jewish children living on Staten Island have been lost and the toll continues to grow, this in a community that is located between Brooklyn and Lakewood, so that there are nearby human and other resources that presumably can be brought to bear to expand religious Jewish educational opportunity in the community. Whatever commitment there is to build new institutions invariably is directed at higher educational levels. Staten Island is now blessed with a number of kollelim and there are also several small mesivtas. As I have underscored over the years, each institution of Torah study is meritorious and thus there is much to welcome in the establishment of these higher level yeshivas. However, the notion that these institutions have a significant or direct impact on what happens at the basic level of Torah chinuch is not supported by experience and certainly not by Staten Island experience.

There is, in short, a desperate need to create new educational arrangements that will reach out to the great number of Russian and Israeli families with young children who can still be part of the Jewish future, if they would be given an appropriate religious education. I

4

have given much thought to the Rabbi Jacob Joseph School establishing one or more schools with an outreach mission and each time that I have considered whether to go forward I have come to the realization that I no longer have the energy or time to undertake such additional responsibilities. In any case, the leadership and creativity must come from within Staten Island. I regard this decision as a personal failure and I cannot say that I am proud.

No one should be proud of the abysmal record of Oorah, the organization that is adept at public relations and fundraising as it promotes the claim that the money it raises goes to assist Jewish public school families that agree to send their children to a yeshiva or day school. Only a small percentage of its income goes toward this purpose. Furthermore, Staten Island is Oorah's center of activity. Our schools have approximately one-hundred Oorah students this year and this is at least one-quarter and probably considerably more of all the students that Oorah claims to have placed, yet we will not receive anything this year from the organization. This will add enormously to the financial burden on our Staten Island schools.

Oorah's wrongdoing is the saddest episode in my more than fifty-five years of devotion to Torah chinuch. I hope that one day I will write at greater length about the moral stain attached to this organization. For now, my prayer and hope is that there will be sufficient concern about the Jewish children whose Jewish future is greatly at risk.

A Note of Gratitude
Of the students who were enrolled last year through Oorah, with the exception of those who graduated, only one did not return this year, this despite the total termination of Oorah support and efforts that it made to discourage parents from sending their children to our schools. In fact, we picked up additional children from these homes.

This achievement did not come easily. It required the determination of Jewish Foundation School leadership to reach out to these families and to plead with them to continue to provide their children with a meaningful Jewish education. Our appreciation goes to Rabbi Richard Ehrlich and Paul Goldstein, respectively JFS' dean and chairman, and especially to Mrs. Miriam Profesorske of our financial office who constantly called the parents and patiently worked with them to achieve the results that we are so proud of.

A Newly-Discovered Alumnus
It is always good to get information about alumni whom we were not aware of, especially since we regularly learn of alumni who are on our list who have passed away, a circumstance that has an important bearing on our fortunes because alumni are a mainstay of RJJ support. But it certainly is not often – in fact, this is certainly a first – that we learn of an alumnus who is celebrating his 105th birthday. That news was conveyed in September in a Newsday story about George Gordon, a resident at the Grace Plaza Nursing and Rehabilitation Center in Great Neck. Mr. Gordon graduated RJJ in 1916 and in describing his life to the reporter, he made mention of the Rabbi Jacob Joseph School.

Mr. Gordon is now on our alumni list. We are hoping that he will remain there for years to come.

5

### Mrs. Rose Goldsmith ע"ה

Rose Goldsmith was born in Norfolk, Virginia, as was her husband. Their parents were also born in the United States and there are members of the family whose American roots go back to the Civil War and perhaps earlier. What distinguishes the family is not so much its longevity on American soil but the continuity of its commitment to Judaism, its fidelity to the tenets of our religion both in terms of belief and practice.

After residing in different parts of the country, as their careers and lives required, the Goldsmiths came about twenty years ago to the Edison-Highland Park area and shortly thereafter Mrs. Goldsmith came to work at our Mesivta. She combined a deep sense of dedication with humility and a fair dose of Southern hospitality. Even after she retired, when she saw that the yeshiva needed her help, she was there. When she passed away in mid-October we lost a valuable friend.

Her work at RJJ was symbolic of something found in many yeshivas. Until relatively recently but no longer, our most valuable institutions which are always hard-pressed to meet even basic obligations depended enormously for their office staff on older women whose salary was low, at times incredibly low, and whose dedication was incredibly high. Nowadays when we go into a yeshiva office, invariably there are kollel wives who do a good job and who certainly are wonderful people but whose family responsibilities make it impossible for them to look at their work as their predecessors did.

Mrs. Goldsmith set a high standard and she is missed.

### Judaic Faculty Bonuses

We wrote in September about our plans to once more give Rosh Hashanah bonuses to our religious studies faculty and asked readers to contribute. We suggested, as well, that other yeshivas and day schools should emulate this practice because these faculty members are woefully underpaid and the start of a new school year which essentially coincides with the holiday season brings additional financial pressure. We received a handful of contributions, notably one that was truly generous and while we fell short of our goal, we are grateful to those who helped.

We know of no other school that adopted the practice and this is hard to accept in a period of unprecedented Orthodox affluence. In nearly every yeshiva and day school there are people of great means who can be responsible for the bonuses, if they would only recognize that it is the right thing for them to do.

Pesach is a bit more than five months away. Hopefully, more yeshivas and day schools will provide a measure of additional help to those who teach our children Torah.

SEARCH BLOG | FLAG BLOG | Next Blog»                Create Blog | Sign In

# Marvin Schick

Comments can be e-mailed to mschick@mindspring.com.

**SUNDAY, NOVEMBER 04, 2007**

## RJJ Newsletter – November 2007

Rav Zeidel Epstein ז״ל served for nearly forty years as a Rebbi and Rosh Mesivta at the Yeshiva on Henry Street, teaching a high Gemara class and teaching, as well, by example and through his inspiring words how religious Jews should live ethical lives in accordance with their Torah obligations. When he retired, he and his wife moved to Israel, living in Jerusalem where his mussar or ethical discourses inspired additional generations of yeshiva students. He passed away in his one-hundredth year, shortly before Rosh Hashanah, mourned by talmidim and Torah leaders in Israel and here. A memorial assembly was held at the Edison Mesivta, with Rav Aharon Feldman, the Rosh Yeshiva of Ner Israel in Baltimore, the featured speaker.

In my remarks, I noted the tendency to speak about our revered Torah leaders by referring to their acts of chesed and their scholarly eminence. This tendency distorts, in my judgment, how we should regard these outstanding people. In truth, most of us do acts of chesed, at least from time to time, and some of us excel at times in Talmudic study. What distinguishes those whom we regard with great admiration and respect is the constancy of their behavior, their endless devotion to the Klal and their unceasing commitment to Torah study. I imagine that we could collect nice stories about Rav Zeidel. What was most remarkable about him was the normalcy of his piety and integrity. These qualities were his essence throughout all of his days. There were no peaks, so to speak, for he always lived at a high ethical level.

His warm feelings toward RJJ never abated and, in a fascinating way, they seemed to grow stronger in Israel. He was gratified by the rebuilding of the yeshiva and nourished by visits of former talmidim from the U.S. who continued to regard themselves as his talmidim. He greeted us in his Jerusalem home with the familiar smile, warmth and enthusiasm that were his hallmarks when he taught us in the classroom.

As he expressed in the introductions to his seforim and in other ways, he was grateful for the way the yeshiva treated him and other Judaic faculty members after their retirement. Year after year, he donated approximately twenty percent of his pension to the yeshiva.

Rav Zeidel was particularly gratified by the achievements of the

### Previous Posts

The Times Does It Again

Jewish Philanthropy

There's Little Left to Conserve

RJJ Newsletter - September 2007

The Futurists

In Uncharted Waters

Pox Brittanica

Jonathan Pollard and Other Crimes

RJJ Newsletter - May 2007

Our Working Poor


Powered by Blogger

Edison Mesivta. Just four years ago, when we dedicated the new Beth Medrash building, he wrote a letter of praise and encouragement, saying "My heart rejoices as I remember the early days" of his teaching at the yeshiva. He asked in instructions that he left to his family that his tombstone include his service at Yeshiva Rabbeinu Yaakov Yosef.

His love of us is engraved on our hearts and while his passing denotes the loss of our last major link to RJJ's glorious past on the Lower East Side, he shall continue to inspire us. His memory is already a blessing.

• • •

Day school and yeshiva enrollment statistics are more than a bunch of numbers telling us how many students there are in how many schools and at what grade levels. They are portals into understanding contemporary Jewish life, providing vital information about the religious health of American Jewry and about what is transpiring in different communities. As a notable example, the well advertised problems confronting the Conservative movement are reflected in declining enrollment in Solomon Schechter schools.

I will conduct next year, please G-D, my third day school census, five years after the previous survey. Inevitably, there will be schools with fewer students, either because of demographic changes in the areas they serve or the establishment of competing day schools or some other factor. We will also learn about schools that have closed. About 20% of the schools included in the 2003 census had fewer students than they had in 1998 and about three dozen day schools in operation in 1998 had closed. Overall, of course, there were enrollment gains and that will be the story when the data is collected next year, primarily because of high fertility in the chassidic and yeshiva-world sectors.

The day school world is remarkably vulnerable to shifting terrain and fortunes, notably at the mesivta or boys high school level where parents are nervous about how their sons will navigate the crucial teen years and increasingly prefer small schools that invariably have but one class at each grade level. They want a school that fits their sons' capabilities and orientation. The ambition - the term is used here in an entirely positive sense - of young Torah scholars to make a mark in the yeshiva world after many years of intensive study has also resulted in the proliferation of smaller mesivtas. As a consequence, some older schools have experienced enrollment declines. Our Edison Mesivta has fewer students than it had at its peak, this despite its strong staff and reputation.

As housing costs make buying a home in Brooklyn or elsewhere in the city and suburban areas beyond the means of many yeshiva-world families and as remaining in Lakewood is a desirable option for former kollel families, there is a strong prospect that Brooklyn yeshivas and Beth Jacobs will suffer enrollment declines.

3/20/2008 12:23 PM

This isn't inevitable, if only because experience teaches that demographic patterns frequently defy predictions. If decline occurs in these schools, likely it will be a slow process. It is certain that Lakewood schools are experiencing explosive growth. There was a two-thirds enrollment increase between 1998 and 2003 and next year's census will show that the trend has continued.

What about Staten Island where the Jewish population has grown at a rapid pace, with the number now estimated at nearly 50,000? Our three schools – they are the only ones providing a basic or elementary school level religious education - have about the same number of students they had last year. In fact, enrollment has been steady for a number of years.

As is true primarily of modern and centrist Orthodox day schools, each year our Staten Island schools lose students whose families have made aliya, on the average between a dozen and twenty students per year. Aliya from the U.S. is rising, thanks in part - and perhaps in large measure - to high day school tuition and medical costs. The numbers may not affect in an appreciable way the overall American Jewish population statistics. They clearly have an impact on day school enrollment and this impact is cumulative, by which I mean that over the span of eight or ten years of elementary school enrollment, the numbers are substantial.

In Willowbrook, where the Staten Island Orthodox are mainly concentrated, the religious population is substantially middle-aged, so that there are fewer children of school age. There are younger families, but their number does not offset the impact of an aging population on school enrollment and this is unlikely to change in view of the paucity of available housing. When we consider the two factors just described, stable enrollment in our schools may be regarded as a measure of success and in an important way is. That is, until we take into account the growing number of Jewish families, many with young children, that have moved to Staten Island in recent years. Enrollment stability means that with each passing year, a smaller percentage of Staten Island Jewish children are now receiving a meaningful religious education.

The percentage of Staten Island Jewish children who attend a day school is among the lowest in the country and it is dropping. Sadly, Staten Island is not alone in this regard, as around the United States and especially away from New York and New Jersey relatively few Jewish children are in full-time Jewish schools. Even in the New York area, the picture is far from satisfactory. In Suffolk County, only a bit more than a handful of Jewish children are in any Jewish day school. As for Staten Island, when we consider how many families are ex-Israelis or the children of ex-Israelis, people who have ongoing contact with family members in Israel, speak Hebrew and have a traditional background, it is tragic how few children are enrolled in a day school.

Unfortunately, the socio-economic profile of Jewish Staten Island works against day school education, firstly because unlike nearly all other significant Jewish communities, Staten Island is bereft of

the Jewish institutional and organizational infrastructure that to an extent can prop up Jewish life. Even Chabad is no more than a minor presence. Economically, the Staten Island community possesses neither the wealth nor the commitment that are important features of Jewish life elsewhere.

Already, thousands of Jewish children living on Staten Island have been lost and the toll continues to grow, this in a community that is located between Brooklyn and Lakewood, so that there are nearby human and other resources that presumably can be brought to bear to expand religious Jewish educational opportunity in the community. Whatever commitment there is to build new institutions invariably is directed at higher educational levels. Staten Island is now blessed with a number of kollelim and there are also several small mesivtas. As I have underscored over the years, each institution of Torah study is meritorious and thus there is much to welcome in the establishment of these higher level yeshivas. However, the notion that these institutions have a significant or direct impact on what happens at the basic level of Torah chinuch is not supported by experience and certainly not by Staten Island experience.

There is, in short, a desperate need to create new educational arrangements that will reach out to the great number of Russian and Israeli families with young children who can still be part of the Jewish future, if they would be given an appropriate religious education. I have given much thought to the Rabbi Jacob Joseph School establishing one or more schools with an outreach mission and each time that I have considered whether to go forward I have come to the realization that I no longer have the energy or time to undertake such additional responsibilities. In any case, the leadership and creativity must come from within Staten Island. I regard this decision as a personal failure and I cannot say that I am proud.

No one should be proud of the abysmal record of Oorah, the organization that is adept at public relations and fundraising as it promotes the claim that the money it raises goes to assist Jewish public school families that agree to send their children to a yeshiva or day school. Only a small percentage of its income goes toward this purpose. Furthermore, Staten Island is Oorah's center of activity. Our schools have approximately one-hundred Oorah students this year and this is at least one-quarter and probably considerably more of all the students that Oorah claims to have placed, yet we will not receive anything this year from the organization. This will add enormously to the financial burden on our Staten Island schools.

Oorah's wrongdoing is the saddest episode in my more than fifty-five years of devotion to Torah chinuch. I hope that one day I will write at greater length about the moral stain attached to this organization. For now, my prayer and hope is that there will be sufficient concern about the Jewish children whose Jewish future is greatly at risk.

3/20/2008 12:23 PM

בס"ד

כו חשון. תשם"ח / November 7, 2007

TO WHOM IT MAY CONCERN:

In a Din Torah held before us on April 29, 2007/ 11 Iyar 5767, between Dr. Marvin Schick's schools, the Jewish Foundation School and RJJ on the one hand, and the Oorah organization on the other, each side agreed to be bound by the decision of the Beis Din and to refrain from making any disparaging remarks about the other.

As we wrote in our ruling of April 12, 2007/ 12 Iyar 5767, we found that there was no evidence of any wrongdoing by Oorah and that it was spending its money in consonance with its mission.

We were therefore dismayed to read on page 4 of the RJJ Newsletter of November, 2007, written by Dr. Schick, the following statement:

*No one should be proud of the abysmal record of Oorah, the organization that is adept at public relations and fundraising as it promotes the claim that the money it raises goes to assist Jewish public school families that agree to send their children t a yeshiva or day school. Only a small percentage of its income goes toward this purpose… Oorah's wrongdoing is the saddest episode in my more than fifty-five years of devotion to Torah chinuch. I hope that one day I will write at greater length about the moral stain attached to this organization.*

Dr. Schick's repetition of the same charges which we found to be unbased constitutes an utter disregard of our ruling and a flagrant violation of his commitment to refrain from making derogatory remarks against Oorah.

This commitment, handwritten by Dr. Schick at the Din Torah, reads as follows:

*לכבוד Roshei Yeshiva of Vaad Harabonim of Torah Umesorah*
*Dear Roshei Yeshiva, א"שלטיא*
*This is to acknowledge that the Rabbi Jacob Joseph School and the Jewish Foundation School fully accept the p'sak of the Beis Din. Furthermore, subsequent to the Din Torah we will not write or transmit in any form charges against Oorah.*
*It is the fervent hope that they א"ה and JFS will work together with Oorah לתגריל תורה ולהאירידה.*

בכבוד רב,
מאיר שיק

We therefore call on Dr. Schick to publicly retract his statement and to redress any damages he may have caused Oorah. Until this is done, Oorah is justified in using any measures permitted by Halacha to rectify this wrongdoing.

Very truly yours,

Rabbis: Dovid Feinstein    Aharon Feldman    Dovid Shustal

(over → )

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

OORAH, INC.,

                               Plaintiff,

        -against-

MARVIN SCHICK, THE JEWISH
FOUNDATION SCHOOL AND THE RABBI
JACOB JOSEPH SCHOOL,

                             Defendants.

07 Civ. _____

**RULE 7.1 STATEMENT OF THE**
**RABBI JACOB JOSEPH SCHOOL**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for Defendants, the Rabbi Jacob Joseph School ("RJJ") certifies that RJJ has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: Newark, New Jersey
       May 7, 2008

PATTON BOGGS, LLP

By: _____
Noah M. Burton (NB-5678)
One Riverfront Plaza, Sixth Floor
Newark, NJ 07102
(973) 848-5600
NBurton@PattonBoggs.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

OORAH, INC.,

|                                    | Plaintiff, |

07 Civ. _____

-against-

MARVIN SCHICK, THE JEWISH
FOUNDATION SCHOOL AND THE RABBI
JACOB JOSEPH SCHOOL,

Defendants.

**<u>RULE 7.1 STATEMENT OF THE
JEWISH FOUNDATION SCHOOL</u>**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for Defendants, the Jewish Foundation School ("JFS") certifies that JFS has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: Newark, New Jersey
May 7, 2008

PATTON BOGGS, LLP

By: _____
Noah M. Burton (NB-5678)
One Riverfront Plaza, Sixth Floor
Newark, NJ 07102
(973) 848-5600
NBurton@PattonBoggs.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Noah M. Burton, hereby certify that true and correct copies of the attached documents,

in the above captioned proceeding, were served upon all parties on the attached service list via

Federal Express overnight delivery this Wednesday, May 7, 2008.


Dated: May 7, 2008
      Newark, New Jersey


                           PATTON BOGGS LLP


                           By: _____
                                Noah M. Burton

                                One Riverfront Plaza
                                6th Floor
                                Newark, New Jersey, 07102
                                Phone: (973) 848-5600
                                NBurton@PattonBoggs.com

49732

## SERVICE LIST

Ronald D. Coleman
Hoffman, Polland, and Furman, PLLC
220 East 42nd Street
New York, NY 10017

49732